[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The commissioner of the Department of Children and Families (DCF) brought this petition to terminate the parental rights of the parents of Elizabeth T., an eight year old child. The father has consented to the termination of his parental rights. The mother, Kelly F.-T., has not. The case was tried to the court. From the evidence and inferences therefrom, the court finds the following facts.
The respondent mother is thirty-one years of age and is a victim of bipolar disorder. She was adopted as a child, but her adoptive mother died when the respondent was eleven years of age. When the respondent was thirteen, her behavior became aberrant and self-destructive. She was hospitalized at Elmcrest Hospital for five months. When she returned home, she had social difficulties and struggled in school.
When the respondent was fourteen she met Elizabeth's father. She became pregnant by him when she was fifteen years old. She had an abortion and quit high school, holding various low-paying jobs. On September 10, 1987, when she was eighteen, she gave birth to her first child. Two other children were born on January 28, 1990 and June 28, 1994, respectively. On June 1994, the respondent gave birth to Elizabeth.
DCF has been involved with the family since May 1995. Between 1995 and CT Page 5599 the filing of this petition, there have been five referrals related to domestic violence, the respondent's depression and alcohol abuse within the family.
On April 9, 1998, DCF filed neglect petitions and applications for orders of temporary custody with respect to Elizabeth and her three siblings. The neglect petitions alleged, inter alia, that the respondent suffered from depression and was overwhelmed with mental illness, for which she was hospitalized at Elmcrest Hospital, leaving Elizabeth and her sibling, Joseph, without proper care. The court (Driscoll, J.)
granted ex parte orders of temporary custody that were subsequently sustained on April 15, 1998 after the parents were given the opportunity for a hearing.
On July 7, 1998, Elizabeth and her siblings were adjudicated neglected and uncared for and were committed to DCF for twelve months. Between July 1998 and March 1999, the respondent cooperated with the court's expectations for reunification.[1] On July 6, 1998, the respondent was admitted to an outpatient program of Community Mental Health Services of Southeastern Connecticut (CMHS). Her primary diagnosis was bipolar disorder and borderline personality disorder and several substance abuse/substance dependence disorders. She attended CMHS into 1999. For these reasons, on March 23, 1999, the neglect disposition was modified to protective supervision and the children were reunited with their parents. At that time, the court issued expectations to the respondent requiring her to, inter alia, attend individual and family counseling and ensure that the children attended school regularly.
Between March 1999 and May 1999, the respondent failed to comply with the court's expectations. In violation of those expectations, she had contact with the children's father several times. In May she kept Elizabeth (and her three siblings) out of school because they had head lice. Neither she nor Elizabeth was in therapy and the respondent was not in compliance with the Intensive Family Preservation Program.
On May 20, 1999, a DCF social worker entered the home after numerous unsuccessful attempts and found it in a deplorable condition. According to the social worker's affidavit:
 The home smelled very strongly of vomit and feces with garbage, dirty dishes and various other items strewn over the floor. There were no beds and only two chairs and a wooden bench for furniture. There was no food in home and mother stated she had no money for food. The children were dirty and did not appear to have been bathed in a while. [Elizabeth's older sister] stated CT Page 5600 she still had lice, even though mother reported to have treated her and all the children, and home numerous times. The children all state they were hungry. The dog and three cats had also not eaten in at least a week. The dog was partially shaved in numerous spots as mother stated children had shaved him and she couldn't stop them. The cats ears appeared to be filled with fleas or lice. Mother stated she and the children have been sleeping every time this worker was there and never heard the knocking nor her dog barking. . . . Mother stated . . . numerous times that she was doing everything that the Department had requested her to and denied ever violating any of the court expectations . . . Mother had a flat affect and many times stared straight ahead. (Exhibit 3, pp. 3-4.)
Another social worker who was present observed Elizabeth, then five years old, go to the respondent and wipe her tears, saying "Don't cry, Mommy," and "Why are you crying?" (Exhibit 4, p. 2.) The respondent told the social workers that she becomes "exhausted" trying to parent the children. (Exhibit 4, p. 2.) The respondent had not fed or bathed the children in some time and had not herself bathed in four days.
On May 21, 1999 a State Trooper entered the home and found three of the children sleeping and difficult to awake. The respondent told the Trooper that the children "were always like this" due to medications. Elizabeth, however, had not been prescribed medication.
On May 23, 1999, DCF again filed applications for orders of temporary custody. The applications were again granted by the court (Driscoll, J.)
on June 4, 1999 and the children were again committed to DCF. Between June 14, 1999 and June 2000, the mother only marginally complied with the court's expectations for reunification. She failed to complete a partial hospitalization program, failed to consistently attend individual therapy and did not secure and maintain appropriate housing. Later in June 1999, the respondent was evicted from her apartment.
The respondent was referred to Backus Hospital's partial hospitalization program with the explicit condition that she complete its program and return to CMHS for treatment. However, she was inconsistent in her attendance at Backus Hospital's program. For this reason, she was terminated by CMHS for repeated noncompliance with treatment recommendations. She was then referred by CMHS to a dual diagnosis partial hospitalization program for treatment of severe psychiatric and substance abuse problems. CMHS made clear to the respondent that she CT Page 5601 would need to successfully complete the partial hospitalization program in order to return to CMHS for aftercare. Since she did not complete the partial hospitalization program. She also would not attend domestic violence groups at the Women's Center and repeatedly undermined a protective order issued by the court prohibiting contact between the children and their father. The respondent was discharged by CMHS on October 3, 1999.
On December 20, 1999, the respondent was admitted to a psychiatric program of Lawrence Memorial Hospital. She was diagnosed with a severe and recurrent major depressive disorder, with the possibility of bipolar disorder, and a borderline personality disorder. She was discharged from that program on December 28, 1999 with the recommendation that she go into Lawrence Memorial's partial hospitalization program. The respondent was also referred to a substance abuse program because she was using drugs to mask her underlying problems. However, the respondent was not interested in the recommended follow-up services. At this time the respondent was homeless and still emotionally unstable.
In 2000 the respondent was hospitalized three times for anxiety attacks, depression and low self-esteem. (Exhibit 1, p. 6.) On June 13, 2000, the court (Driscoll, J.) found that reasonable efforts to reunify mother and daughter no longer were appropriate. Two weeks later the respondent began psychotherapy with Dr. Steven Goldberg, Ph. D., who diagnosed her as having "bipolar 1 disorder, moderate, chronic." (Exhibit A.) The respondent also began to see Dr. Rajesh Parekh, M.D. who prescribed medications for her disorder. However, because of Judge Driscoll's finding, DCF reduced the respondent's supervised visitation with Elizabeth from once a week to once a month.
On November 16, 2000, DCF filed a petition to terminate the respondent's parental rights to Elizabeth. At the time of the filing of the petition, the respondent was on medication to help alleviate her depression and anxiety attacks.
On July 13, 1999, Dr. Robert Meier conducted a psychological evaluation of the respondent. Meier concluded that to be reunited with Elizabeth the respondent had to maintain a partial hospitalization program and participate in drug and alcohol testing to avoid dependency or drug abuse.
The filing of the termination petition had a clear if shortlived salutary effect on the respondent, as evidenced by Respondent's exhibits A and B. During a three-to-four month period, from November 2000 to March 2001, the respondent was able to maintain steady housing and finances. She participated in a drug rehabilitation program at St. Francis Care CT Page 5602 Behavioral Health where she attended a variety of clinical and psycho-educational groups and was drug free. She attended a partial hospitalization program at CMHS where she received therapy. The respondent also received visiting nurse in-home services to monitor her medication twice a day. She focused on regaining custody of Elizabeth (as well as her other children.)
On February 2, 2001, Goldberg wrote that the respondent had completed thirty sessions with him and that "[h]er adherence to therapy has been excellent, as is her willingness to follow treatment recommendations." (Exhibit A.) Goldberg had also worked with the respondent on parenting skills and he found that the respondent had made progress in this area as well. Goldberg wrote further in his report that the respondent's
 insight has grown remarkably since I first began working with her. She has become well aware of her shortcomings and deficits and is now quite willing to take responsibility for her actions. She no longer denies her past behaviors, nor does she blame others for her current situation. I had heard that at one time she was a substance abuser, however for the past seven months I have seen no evidence of that. Her nurse, who sees her twice daily, reports that [the respondent's] home is always clean and that she takes her medications "religiously." Moreover, he has told me that [the respondent's] interactions with her kids are typical of a loving mother and a pleasure for him to witness.
 It is clear that [the respondent] is getting her life in order. She is divorced now and better able to resolve the abusive relationship she had with her husband. Her finances are fairly stabilized. . . . [She has] her own car, maintains her own insurance, and is quite capable of caring for herself. This is not to say she is without problems. The difference is . . . today, she is capable of handling most of life's challenges on her own and is discerning enough to know when and how to seek help from others. (Exhibit A.)
Goldberg opined that the respondent's prognosis was positive and that terminating her parental rights would be "unreasonable and cruel." Goldberg advocated increased visitation for the respondent and eventual reunification.
Because of this progress, DCF offered the respondent weekly supervised CT Page 5603 visits with Elizabeth for twelve weeks at the Smith-Bent Visitation Center. The respondent then minimally complied with the expectations of DCF and Smith Bent, missing several appointments. In June 2001, DCF again modified the visits between the respondent and Elizabeth to once a month.[2]
On August 29, 2001, the respondent was discharged by the Child and Family Agency of Southeastern Connecticut, Inc. (CFA) with whom she had been working since February 2001 on parenting skills. In its discharge summary, CFA reported that the respondent demonstrated discipline techniques but "could benefit from gaining more knowledge in this area as demonstrated by her difficulty in following through with consequences. [She] continued to demonstrate difficulty in following through with consequences throughout her involvement in the program." (Exhibit 14.) CFA also found that although the respondent "talks with Elizabeth during visits, [she] could benefit from gaining knowledge in this area as demonstrated by her lack of eye contact during conversations and her bringing some inappropriate conversation to the visits. . . . [The respondent] does not get on Elizabeth's physical level, but rather sits in the chair while Elizabeth plays in the room." (Exhibit 14.)
During the balance of 2001, the respondent's mental health deteriorated significantly. She discharged her visiting nurse and stopped taking her medication. (Exhibit 2, p. 5.) On October 30, 2001, the respondent's therapist, Sherilyn Wilson, a licensed clinical social worker, sent the respondent a letter warning that her file would be closed if she missed any further appointments. The respondent continued to miss appointments and, on December 12, 2001, Wilson informed the respondent that she would no longer be her therapist.
During the balance of 2001 and early 2002, the respondent's conduct and her living arrangements were often erratic and unstable.[3] She cohabited with a man who, by her own account, began to act "strange" and who she claimed planned to kill her friends. At times she refused to advise DCF as to her address. On January 24, 2002, Margaret Frisch, a licensed clinical social worker with CFA wrote to DCF that "[t]here is a great deal to indicate that mother, inspite [sic] of her efforts at therapy and medication, has not been able to get control over her illness and that her ability to parent remains severely compromised." (Exhibit 11.)
The case was tried to the court over three days. The court heard from eight witnesses and the guardian ad litem. The respondent elected not to testify. The court received over two dozen documents in evidence.
"The termination of parental rights is defined as the complete CT Page 5604 severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . [and as such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001). "When petitioning to terminate parental rights without consent, [DCF] must allege and prove by clear and convincing evidence, one or more of the specific grounds set forth in General Statutes § 17a-112 (b) [now § 17a-112 (j)]. . . . The same evidence certainly can establish more than one ground for termination." (Citations omitted; internal quotation marks omitted.) Inre Kezia M., 33 Conn. App. 12, 16, 632 A.2d 1122, cert. denied,228 Conn. 915, 636 A.2d 847 (1993).
 I
"To terminate parental rights under § 17a-112 (c), now (j), the department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. In accordance with § 17a-112 (c)(1) [now (j)(1)], the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate." (Internal quotation marks omitted.)In re Ebony H., 68 Conn. App. 342, 348-49, 789 A.2d 1158 (2002)
On June 13, 2000, the court (Driscoll, J.) found that reasonable efforts to reunify mother and daughter were no longer appropriate. That finding has never been challenged. For this reason, the court need not make a finding in this proceeding as to whether DCF used reasonable efforts to reunify mother and daughter. General Statutes § 17a-112
(j)(1); In re Gary B., 66 Conn. App. 286, 290-91, 784 A.2d 412 (2001); cf. In re Amelia W., 62 Conn. App. 500, 504-05, 700 A.2d 619 (2001).
 II
The sole ground of the petition is that the mother has failed to achieve sufficient personal rehabilitation. "Failure of a parent to achieve sufficient personal rehabilitation is one of six [now seven] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. General Statutes (Rev, to 1997) § 17a-112 (c)(3) (B), as amended by Public Acts 1998, No. 98-241, § 8, now (j)(3) (B). That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age CT Page 5605 and needs of the child, the parent could assume a responsible position in the life of that child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . [The Appellate Court] recently explained that in assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) In re Sheila J., 62 Conn. App. 470,479-80, 771 A.2d 244 (2001). "In determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." In reVincent D., 65 Conn. App. 658, 670, 783 A.2d 534 (2001)
"Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re DanielC., 63 Conn. App. 339, 357, 776 A.2d 487 (2001). A claim of failure to rehabilitate, however, implicates a judicially created exception to Practice Book § 33-3(a). "Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, [the Appellate Court has] determined that with regard to termination petitions brought under § 17a-112 (c)(3)(B), [now § 17a-(j)(3)(B)], the trial court may in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of that statute. . . . In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citations omitted; emphasis in original; internal quotation marks omitted.) In re Latifa K., 67 Conn. App. 742, 748-49, 789 A.2d 1024
(2002) CT Page 5606
At the core of the respondent's problems is her bipolar disorder. This illness was a principal cause of her losing custody of her children in 1998 and the cause of her losing custody in May 1999. Until Judge Driscoll's finding in June 2000 that further efforts to reunify the respondent and her daughter were not appropriate, the respondent had made little progress in gaining control of her disorder. Thereafter she began to make real progress toward that goal, through March 2001. In the spring of 2001, she decompensated, stopped seeing her therapist on a consistent basis, stopped taking the medication necessary to control her psychiatric disorder, began acting erratically, cohabited with an inappropriate person when she had custody of another daughter and failed to maintain stable housing.[4]
While recognizing the progress that the respondent had begun to make between June 2000 and January 29, 2001, the date of his final report, Dr. Robert Meier, Ph. D., the court appointed psychologist who evaluated the respondent in 1998, 1999 and 2001, observed that if the respondent in 2001 was discharged from therapy because of inconsistent attendance, and stopped taking her medication, then reunification efforts should be abandoned and Elizabeth should be given the opportunity for permanency. "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks omitted.)In re John G., 56 Conn. App. 12, 24, 740 A.2d 496 (1999). These misfortunes indeed befell the respondent. Moreover, each time the respondent deteriorated, in 1998, 1999 and 2001-2002, she was barely able to care for herself, let alone a child of Elizabeth's age and needs. Elizabeth is an eight year old girl who suffers from post traumatic stress disorder, dysthymia, separation anxiety disorder, attention deficit disorder and nighttime enuresis. She has been prescribed Clonidine and Ritalin for her attention deficit, impulsivity, sleep disorder and anxiety.
"Termination has been consistently recognized as being in the best interests of the child when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." (Internal quotation marks omitted.) In re Jessica S., 51 Conn. App. 667,673-74, 723 A.2d 356, cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999), quoting In re Nicolina T., 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987). Our Supreme Court has held that a parent's rights can be terminated because of her mental condition, even if she is not at fault. Parental rights are not terminated because of a parent's mental condition nor because of her refusal to take prescribed medication, but because of the parent's inability to function as a parent. In re Jessica S., supra,51 Conn. App. 673; In re Nicolina T., supra, 9 Conn. App. 606-607; see CT Page 5607 also In re Kelly S., 29 Conn. App. 600, 608, 616 A.2d 1161 (1992). "[I]n weighing the interests of the child against the hardship imposed on the parent, the legislature may properly strike the balance at the point where the mental . . . deficiency, even though involving no fault, is so great as to render the parent incapable of measuring up to the child's needs as those are delineated in [§ 17a-112 (j)]." In re Jessica S.,51 Conn. App. 673. Moreover, it is settled that the failure of a parent to take prescribed medication for a psychiatric condition such as bipolar disorder or schizophrenia can lead to the termination of parental rights. State v. Anonymous, 179 Conn. 155, 157-58, 425 A.2d 939 (1979);In re Antony B., 54 Conn. App. 463, 735 A.2d 893 (1999); cf. In re SabaP., 13 Conn. App. 605, 538 A.2d 711, cert. denied, 207 Conn. 811,541 A.2d 1241 (1988) (even with medication, mother unable to bond positively with child); see also In re Bartholomew N., Superior Court, Child Protection Session at Middletown (December 19, 2001); In theInterest of Donald B., Superior Court, judicial district of New Haven, Juvenile Matters (February 28, 2000); In the Interest of Lorenzo M.,
Superior Court, Child Protection Session at Middletown (December 22, 1999); In the Interest of Matthew S., Superior Court, Child Protection Session at Middletown (July 16, 1999), aff'd, 60 Conn. App. 127, 133,758 A.2d 459 (2000); In re Ashley E., Superior Court, Child Protection Session at Middletown (July 23, 1997), aff'd, 62 Conn. App. 307, 315,771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001); In reAngela E., Superior Court, Child Protection Session at Middletown (June 20, 1997).
By clear and convincing evidence the court finds that Elizabeth has been previously found to be neglected and that the respondent has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Elizabeth's age and needs, the respondent could assume a responsible position in Elizabeth's life.
 III A
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., supra, 62 Conn. App. 315. "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev, to 1999) § 17a-112 (d) (now § 17a-112 (k)]." (Internal quotation marks omitted.) In re Deana E., 61 Conn. App. 185, 189-190,763 A.2d 37 (2000); cert denied, 255 Conn. 941, 768 A.2d 949 (2001). CT Page 5608
 Mandatory Findings 1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
The respondent was timely referred to individual therapy, parenting classes, substance abuse evaluations and treatment, partial hospitalization program, family therapy, housing assistance and financial services. DCF also provided supervised visitation to the respondent, as well as case management services and foster care for Elizabeth. These services were appropriate to facilitate reunion of the respondent with her daughter, given the respondent's personal parental deficiencies.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
DCF made reasonable efforts to reunite the respondent with her daughter, although it was excused from doing so by the finding of the court (Driscoll, J.) on June 13, 2000.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
On March 23, 1999, the respondent was issued expectations by the court. Those expectations required the respondent to do the following:
1. Keep all appointments set by or with DCF, keep whereabouts known toDCF or your attorney. The respondent kept appointments with DCF but toward the end of 2001 and early 2002 refused to advise DCF as to where she was living.
2. Visit the child as often as DCF permits. The respondent complied with this expectation.
3. Participate in individual counseling. The respondent complied with this requirement until the first half of 2001. Thereafter, she failed to consistently attend counseling.
4. Secure and maintain adequate housing and income. The mother did not comply with this requirement until June 2000. Thereafter, CT Page 5609 she had adequate housing until late-2001. Thereafter she did not have appropriate and stable housing.
5. No substance abuse. There is no evidence that the respondent did not comply with this expectation.
6. No involvement with the criminal justice system. There is no evidence that the respondent did not comply with this expectation.
The court's expectations also required the respondent not to permit contact between Elizabeth and her father. The respondent violated this requirement in 1999. Thereafter, there is no evidence that the respondent did not comply with this expectation.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Elizabeth loves her mother, considers her as her psychological parent[5] and wishes to be reunited with her. She also was developing a bond with her former foster family. Tragically, they elected not to adopt her. Elizabeth's current foster mother is an inappropriate foster placement from which the court has ordered Elizabeth removed.
5. Finding regarding the age of the child.
Elizabeth is now eight years old.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
The respondent has consistently visited Elizabeth. Other than this, however, the respondent failed to follow through with the services to which she was referred until June 2000. Thereafter, she consistently saw her psychologist and maintained the regimen of her medication. During a three-to four month period, from November 2000 to March 2001, the CT Page 5610 respondent was able to maintain steady housing and finances. She participated in a drug rehabilitation program at St. Francis Care Behavioral Health where she attended a variety of clinical and psycho-educational groups and was drug free. She attended a partial hospitalization program at Community Mental Health of Southeastern Connecticut where she received therapy. She received visiting nurse in-home services to monitor her medication twice a day.
In the Spring of 2001, this promising trajectory altered course. The respondent stopped seeing her therapist and stopped taking her medication. Thereafter, her behavior and judgment became erratic and unstable and her housing became unstable.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
The respondent was not prevented from maintaining a meaningful relationship with Elizabeth by the unreasonable act or conduct of Elizabeth's father, or by the unreasonable act of any other person or by her economic circumstances.
 B.
Although in determining whether to grant a petition to terminate parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § 17a-112
(k); In re Tyscheicka H., 61 Conn. App. 19, 762 A.2d 916 (2000); "[t]he trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). Notably, General Statutes (Rev. 1999) § 17a-112 (i), now § 17a-112
(p), expressly provides that its provisions "shall be liberally construed in the best interests of any child for whom a petition under this section has been filed." "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) Inre Shyina B., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000); cf. General Statutes § 45a-719.[6]
The court recognizes that Elizabeth wants to continue a relationship CT Page 5611 with her mother. Indeed, she wishes to be reunited with her mother. However, she also sees her mother as withdrawn, sad, crying and sleeping a great deal. (Exhibit 11, p. 2) While these memories may be based on experiences in 1998 and 1999, they accurately reflect the condition into which the mother periodically retrogresses.
Elizabeth is not in a preadoptive placement. Her previous foster parents elected not to adopt her, resulting in her removal from that home. This was very traumatic to Elizabeth and resulted in her suffering depression. The court has ordered that she be removed from the home of her current foster mother. Pre-adoptive placement, however, is not a prerequisite to the termination of parental rights. In re Eden F.,250 Conn. 674, 709, 741 A.2d 873, reargument denied, 251 Conn. 924,742 A.2d 364 (1999).
The court has considered that "in some circumstances it would be contrary to a child's best interest to sever his [or her] ties to a parent even though statutory cause to do so could be found. If, for instance, no prospective adoptive home were available, and a child was likely to be subjected to a number of short-term foster placements, a court might determine that maintaining a relationship even to a noncustodial and inadequate parent was preferable, for a given child, to having no parent at all. Recent studies of children in long-term foster care have provided evidence that suggests that `continued contact with the natural parent generally promotes the child's sense of well-being and emotional security' even for `children who were separated from their parents at a very early age and whose subsequent contacts with their parents are sporadic.' M. Garrison, `Why Terminate Parental Rights?' 35 Stan. L. Rev. 423, 461 (1983)." In re Jessica M., 217 Conn. 459, 466 n. 5, 586 A.2d 597 (1991); see also In re Alissa N., supra, 56 Conn. App. 211
n. 5.
This, however, is not Elizabeth's situation. This is not a case where no prospective adoptive home is available and where the child is likely to be subjected to a number of short-term foster placements in the future.
Elizabeth is an eight year old child with special needs. As Margaret Frisch of CFA wrote in her report of January 24, 2002, after the mother's supervised visitations were increased from once a month to once a week, Elizabeth's level of anxiety increased as a result of the mother's behaviors during the visits.
As Meier testified, she requires real permanency now. There is no reason to delay her opportunity for adoption and risk "[t]he well-known deleterious effects of prolonged temporary placement on the child. . . ." CT Page 5612In re Juvenile Appeal (83-CD), 189 Conn. 276, 292, 455 A.2d 1313
(1983).[7] By clear and convincing evidence the court finds that it is in Elizabeth's best interests that the respondent's parental rights be terminated.
The petition is granted. The court terminates the respondent's parental rights. The Commissioner of the Department of Children and Families is appointed statutory parent for Elizabeth for the purpose of securing a permanent adoptive family for her. The commissioner shall file with this court no later than 30 days following the date of judgment a written progress report of efforts to effect such permanent placement and file further reports every three months thereafter, as required by state and federal law. The assistant attorney general is directed to confirm that this case is properly and timely scheduled for review in the regional court.
In light of the evidence of the foster mother's treatment of Elizabeth, the court orders DCF to inform the court within twenty days as to whether proceedings to suspend or revoke the foster mother's license are being commenced. DCF shall not, in so advising the court, disclose the identity of that foster parent.
Dated at Middletown this 2nd day of May, 2002.
BY THE COURT
_________________________ Bruce L. LevinJudge of the Superior Court